UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X Our File No. 16752DSMTN
LINDA OLSEN,

                                    13 CIV. 8850(KBF)

                     Plaintiff,

               -against-              **NOTICE OF RULE
                                         56 MOTION**

FEDERAL NATIONAL MORTGAGE
ASSOCIATION a/k/a FANNIE MAE,

                                    Hon. Katherine B. Forrest

                  Defendants.
------------------------------------------------------------------X Returnable:  10/26/15
FEDERAL NATIONAL MORTGAGE
ASSOCIATION a/k/a FANNIE MAE,

                   Third-Party Plaintiff,

              -against-

WORLD HOMES REALTY, f/k/a THE
PRUDENTIAL WORLD HOMES-WORLD
HOMES, INC.,

                Third-Party Defendant.
------------------------------------------------------------------X
WORLD HOMES, INC. d/b/a WORLD HOMES
REALTY i/s/h/a WORLD HOMES REALTY, f/k/a
THE PRUDENTIAL WORLD HOMES-WORLD
HOMES, INC.,

             Second Third-Party Plaintiff,

              -against-

CYPREXX SERVICES, LLC,

             Second Third-Party Defendant.
------------------------------------------------------------------X

          PLEASE TAKE NOTICE, that upon the Declaration of Margot L. Ludlam,

Esq., dated September 25, 2015, the accompanying Memorandum of Law, Statement of

Material Facts, with attached exhibits, and all pleading and proceedings heretofore had herein, third-party defendant/second third-party plaintiff, WORLD HOMES, INC. d/b/a WORLD HOMES REALTY i/s/h/a WORLD HOMES REALTY, f/k/a THE PRUDENTIAL WORLD HOMES-WORLD HOMES, INC., shall make a motion before Honorable Katherine B. Forrest, at the United States Courthouse for the Southern District of New York, 500 Pearl Street, New York, New York 10007 on the 26th day of October, 2015, or as soon thereafter as counsel can be heard, for an Order, pursuant to Rule 56 of the Federal Rules of Civil Procedure, granting third-party defendant/second third-party plaintiff, WORLD HOMES, INC. d/b/a WORLD HOMES REALTY i/s/h/a WORLD HOMES REALTY, f/k/a THE PRUDENTIAL WORLD HOMES-WORLD HOMES, INC. summary judgment and dismissing the claims and causes of action asserted against it by defendant/third-party plaintiff FEDERAL NATIONAL MORTGAGE ASSOCIATION; and for such other and further relief as this Honorable Court deems just and necessary.

The above-entitled action is for personal injuries.

PLEASE TAKE FURTHER NOTICE, that pursuant to Order dated and filed September 11, 2015, opposition papers, if any, are required to be filed and served upon the undersigned by October 19, 2015.

Dated: Hicksville, New York
September 25, 2015

By:_____/s/_____

MARGOT L. LUDLAM, ESQ.
(MLL)#5686
BAXTER SMITH & SHAPIRO, P.C.
Attorneys for Third-Party Defendant/
Second Third-Party Plaintiff
99 North Broadway
Hicksville, New York 11801
(516) 997-7330

TO:   RAWLE & HENDERSON, LLP
      Attorneys for Second Third-Party Defendant
      CYPREXX SERVICES, LLC
      Payne Shoemaker Building
      240 N. Third Street, 9th Floor
      Harrisburg, Pennsylvania 17101

      LAW OFFICES OF JOHN C. DEARIE
      Attorneys for Plaintiff
      515 Madison Avenue, 11th Floor
      New York, New York 10022
      (212) 980-0404

      GOLDBERG SEGALLA LLP
      Attorneys for Defendant/Third-Party Plaintiff
      200 Garden City Plaza, Suite 520
      Garden City, New York 11530
      (516) 281-9800
      File No.: 5080.0006

## CERTIFICATE OF SERVICE BY ELECTRONIC-FILING

I, MARGOT L. LUDLAM, hereby certify that on September 28, 2015, the foregoing

documents, NOTICE OF RULE 56 MOTION with STATEMENT OF MATERIAL FACTS,

DECLARATION OF MARGOT L. LUDLAM and MEMORANDUM OF LAW, was filed with

the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure,

and/or the Southern District's Local rules and/or the Southern District's Rules of Electronic

Service upon the following parties:

RAWLE & HENDERSON, LLP
Attorneys for Second Third-Party Defendant
CYPREXX SERVICES, LLC
Payne Shoemaker Building
240 N. Third Street, 9th Floor
Harrisburg, Pennsylvania 17101

LAW OFFICES OF JOHN C. DEARIE
Attorneys for Plaintiff
515 Madison Avenue, 11th Floor
New York, New York 10022

GOLDBERG SEGALLA LLP
Attorneys for Defendant/Third-Party Plaintiff
200 Garden City Plaza, Suite 520
Garden City, New York 11530

/s/
MARGOT L. LUDLAM, ESQ.
(MLL)#5686

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X Our File No. 16752DSMTN

LINDA OLSEN,

                                              13 CIV. 8850(KBF)

                Plaintiff,

                -against-                  **DECLARATION OF MARGOT**
FEDERAL NATIONAL MORTGAGE         **LUDLAM IN SUPPORT OF**
ASSOCIATION a/k/a FANNIE MAE,      **WORLD HOMES' MOTION**
                                        **FOR SUMMARY JUDGMENT**

               Defendants.
-----------------------------------------------------------------------X

FEDERAL NATIONAL MORTGAGE
ASSOCIATION a/k/a FANNIE MAE,

              Third-Party Plaintiff,

         -against-

WORLD HOMES REALTY, f/k/a THE
PRUDENTIAL WORLD HOMES-WORLD
HOMES, INC.,

             Third-Party Defendant.
-----------------------------------------------------------------------X

WORLD HOMES, INC. d/b/a WORLD HOMES
REALTY i/s/h/a WORLD HOMES REALTY, f/k/a
THE PRUDENTIAL WORLD HOMES-WORLD
HOMES, INC.,

           Second Third-Party Plaintiff,

         -against-

CYPREXX SERVICES, LLC,

           Second Third-Party Defendant.
-----------------------------------------------------------------------X

      MARGOT L. LUDLAM, ESQ., declares and affirms under the penalties of perjury

and pursuant to 28 U.S.C §1746 that the foregoing is true and correct:

1.      I am an attorney duly licensed to practice in the State of New York and am a member of the law firm of BAXTER SMITH & SHAPIRO, P.C., counsel for the third-party defendant/second third-party plaintiffs WORLD HOMES, INC. d/b/a WORLD HOMES REALTY i/s/h/a WORLD HOMES REALTY, f/k/a THE PRUDENTIAL WORLD HOMES-WORLD HOMES, INC. (hereinafter "WORLD HOMES"), in the above-entitled action and as such I am fully familiar with the facts and circumstances of this action based upon a review of the file maintained by my office.

2.      This affirmation is submitted in support of WORLD HOMES' motion for an Order pursuant to Federal Rules of Civil Procedure Rule 56, granting WORLD HOMES, summary judgment and dismissing defendant/third-party plaintiffs FEDERAL NATIONAL MORTGAGE ASSOCIATION a/k/a FANNIE MAE's (hereinafter "FANNIE MAE") third-party action, and all claims asserted against WORLD HOMES, on the grounds that no party has established a prima facie case of breach of contract or negligence as against WORLD HOMES.

## PROCEDURAL HISTORY

3.      This action was brought on behalf of plaintiff, LINDA OLSEN, pursuant to 28 U.S.C. §1332 claiming negligence and premises liability as against defendant FANNIE MAE. A copy of plaintiff's complaint filed on December 13, 2013 is annexed hereto as **Exhibit "A"**.

4.      In her complaint, plaintiff claims that she sustained injuries on May 21, 2011 while in the scope of her employment as a real estate agent. Plaintiff claims that as she was showing the property at 71 Richardsville Road in Carmel, New York, owned by

FANNIE MAE, she was caused to fall off the front porch because of FANNIE MAE's negligence, including the failure to maintain or repair the railing on the front porch.

5.     Defendant, FANNIE MAE filed and served an answer on January 17, 2014. A copy of FANNIE MAE's answer is annexed hereto as **Exhibit "B"**.

6.     On October 8, 2014, FANNIE MAE filed and served a third-party summons and third-party complaint against WORLD HOMES alleging breach of contract, contractual indemnification, common law indemnity and common law contribution. A copy of FANNIE MAE's third-party summons and third-party complaint is annexed hereto as **Exhibit "C"**. Pursuant to the Court directive, a corrected version of the third-party complaint was re–filed on March 11, 2015.

7.     On October 24, 2014, WORLD HOMES filed and served an answer to the third-party complaint, a copy of which is annexed hereto as **Exhibit "D"**.

8.     On December 18, 2014, FANNIE MAE filed and served a second third-party summons and second third-party complaint on second third-party defendant CYPREXX SERVICES, LLC (hereinafter "CYPREXX"), a copy of which is annexed hereto as **Exhibit "E"**. On or about January 23, 2015, counsel for FANNIE MAE filed and served a notice to withdraw second third-party complaint, a copy of which is annexed hereto as **Exhibit "F"**.

9.     On February 26, 2015, WORLD HOMES filed and served a second third-party summons and second third-party complaint as against CYPREXX alleging contribution and common law indemnity, a copy of which is annexed hereto as **Exhibit "G"**.

10.    On February 26, 2015, second third-party defendant CYPREXX filed and served its answer to second third-party complaint, a copy of which is annexed hereto as **Exhibit "H"**.

11.    On May 1, 2015, plaintiff LINDA OLSEN appeared for a deposition. A copy of the transcript from plaintiff's deposition is annexed hereto as **Exhibit "I"**.

12.    On June 26, 2015, Courtney Schnell appeared for a deposition on behalf of FANNIE MAE. A copy of the transcript from Courtney Schnell's deposition is annexed hereto as **Exhibit "J"**.

13.    On July 19, 2015, Anthony Aquilia appeared for a deposition on behalf of WORLD HOMES. A copy of the transcript from Anthony Aquilia's deposition is annexed hereto and **Exhibit "K"**.

14.    On July 27, 2015, Tony Elliot appeared for a deposition on behalf of CYPREXX. A copy of the transcript from Tony Elliot's deposition is annexed hereto as **Exhibit "L"**.

15.    By order dated September 11, 2015, this Court extended the time by which the parties had to file dispositive motions to September 28, 2015. A copy of this Court's order dated September 11, 2015 is annexed hereto as **Exhibit "M"**. Accordingly, this motion is timely filed.

## STATEMENT OF FACTS

16.    In her complaint, plaintiff alleges that she sustained injuries on May 21, 2011, while in the scope of her employment as a real estate agent. See Exhibit "A" at paragraph 1. Plaintiff further alleges that in her capacity as a real estate agent, plaintiff was showing property owned by FANNIE MAE at 71 Richardsville Road, Carmel, New

York when she was caused to fall. Id. Plaintiff alleges that FANNIE MAE was negligent in its failure to maintain or repair the railing on the front porch, causing the railing to fall or failing to support and protect plaintiff from falling off the porch. Id.

17.     In her complaint, plaintiff further alleges that the railing on the porch at the premises was in a "dilapidated state of disrepair, rotted and/or otherwise unable to support the reasonable weight of a person on the residential porch, creating a dangerous condition that Defendant or its employees, agents and/or servants either knew or should have known about creating a zone of danger at or near the porch....". See Exhibit "A" at paragraph 5.

18.     Plaintiff further alleges in her complaint that FANNIE MAE knew or should have known that "employees of Prudential World Homes Realty with whom FANNIE MAE had a listing agreement to offer and show the house for sale, and prospective purchasers would be expected to explore and investigate the dangerous porch, making it reasonably foreseeable that a person, including the Plaintiff would walk near the railing and fall off the porch because of the inability of the railing to support a person from falling." Id.

19.     Plaintiff alleges in her complaint that FANNIE MAE breached its duty by failing to maintain the porch and railings, by failing to repair the railing and porch, by failing to warn the public, including plaintiff, of the railing, by failing to inspect the porch or railing, by failing to supervise the showing of the property and by failing to implement policies and procedures for safety.  See Exhibit "A" at paragraph 7.

20.     On January 19, 2011, plaintiff entered into an Independent Contractor Agreement with WORLD HOMES as a sales associate for WORLD HOMES.  A copy of

the Independent Contractor Agreement is annexed hereto as **Exhibit "N"**. Pursuant to the agreement, plaintiff became engaged as an independent contractor for WORLD HOMES. The contract was signed by plaintiff and Joseph Kaplan, the broker for WORLD HOMES.

21.    In April 2011, FANNIE MAE and WORLD HOMES entered into a Master Listing Agreement, a copy of which is annexed hereto as **Exhibit "O"**. The FANNIE MAE Master Listing Agreement was signed by Tiffany Davis-Fletcher, on behalf of FANNIE MAE, and Joseph Kaplan on behalf of WORLD HOMES.

22.    The section entitled **AGREEMENT,** at paragraph 4. **Services-**, provides as follows:

### A. Property Assignments.

Fannie Mae may assign properties to Broker prior to listing the Properties for sale... through Fannie Mae's Asset Management Network, Equator, or other electronic platform or non-electronic means designated by FANNIE MAE for the purpose of making property assignments....

Broker agrees to perform certain Services with respect to each of the Property Assignments which such Services include, but are not limited to, the completion of property occupancy checks, the issuance of broker price opinions and certain property management and repair services as described in the REO Sales Guide.... The REO Sales Guide is incorporated herein by this reference.

See Exhibit "O" at 4, paragraph 4.

23.    Under paragraph 25, Definitions, the master listing agreement defines "Services" as "tasks to be performed by Broker under this Agreement, including the property management, listing, marketing and other related services described in the REO Sales Guide, and the Vendor Services. "Vendor Services" is defined in the

agreement as "Services that are delegated by Broker to Vendors in connection with

this Agreement." See Exhibit "O" at 23-24, paragraph 25.

24.  **Paragraph 12. Indemnity**-provides, in part, as follows:

> Broker shall indemnify and hold harmless and defend Fannie Mae, ...
> against all claims, liabilities, costs, damages, suits, actions, losses and
> expenses, including reasonable attorneys' fees and cost of suit, arising out
> of or resulting from any third party claim in connection with:...(c) broker's
> negligence, willful misconduct, breach of any representation or warranty
> under this Agreement or failure to perform its obligations under this
> Agreement; (d) any injuries to person (including death) or damages to
> property caused by negligent or willful acts of Broker or its subcontractors
> (except to the extent that such damages are caused by the negligence or
> willful misconduct of Fannie Mae or any of its employees);...

See Exhibit "O" at 18, paragraph 12.

25.  FANNIE MAE provided an REO Sales Guide to WORLD HOMES that was

in effect in May 2011, which is a document that contains approximately 357 pages.  For

ease and convenience, annexed hereto is the front page of the REO Sales Guide,

along with Section 2, entitled Assessing and Maintaining Property Conditions with Field

Services and Other Vendors, the section applicable to the claims at hand.  This portion

of the REO Sales Guide is annexed hereto as **Exhibit "P"**.

26.  On page 69 of the REO Sales Guide is Figure 3 entitled "Field Services

Check List."  The Field Services Check List contains two columns.  The right column is

entitled "Safety Hazard Checklist", under which is provided as follows:

> When performing initial services on all FANNIE MAE properties each Field
> Service Company is asked to check for common safety hazards that may be
> found.   All companies are to ensure these hazards are identified on their
> updates. Many of the issues below are to be addressed immediately.  Some of
> the common safety hazards we ask the Field Service Companies to look for
> include:

> Stairways:

- Repair Missing or broken steps.
- Repair missing or loose handrails.

Porch/Deck/Patio:

- Repair missing or loose steps.
- Repair missing or loose handrails.

See Exhibit "P" at 69, Figure 3.

27.  At the bottom of the right hand column in Figure 3 is a section entitled

"Broker Checklist", which provides as follows:

> When performing property inspections, the following Broker
> Related items are expected:
>
> • Realtor signage is posted.
> • Property is secured and locked.
> • Lockbox is present and coded correctly.
> • Keys are present in lockbox and are able to access property.
> • Utilities are turned on.

Id.  These broker responsibilities are also listed under the section entitled **Fannie Mae**

**Broker/Asset Manager/Field Services Responsibilities.**  See Exhibit "P" at 70-71.  In

addition to the itemized broker checklist in Figure 3, the broker's responsibilities also

include:

> • Notify the Field Services vendor of any special requests or
>   information on a property (i.e., unit number, gate codes), or
>   if you notice a change in the status of the property.
> • Obtain bid(s), and Fannie Mae Sales Representative or
>   AMP Asset Manager approvals, before doing any work that
>   is not covered in the Field services process.
> • Notify the Field Services vendor about any issues with the
>   property.

28.  On page 65 of the REO Sales Guide, under the section entitled **National**

**Property Maintenance Companies**, the guide states as follows:

> While some properties in Fannie Mae's inventory remain assigned to SAM
> Contractors, Fannie Mae now utilizes four national property maintenance

companies, or Field Service vendors to perform initial services, and to perform ongoing services on any property coming into Fannie Mae's inventory...

The four major field service vendors are:

- Field Asset Services, Inc.
- Safeguard Properties, Inc.
- Cyprexx
- Asset Management Specialist.

See Exhibit "P" at 65.

29. Pursuant to table 9, on pages 67 and 68 of the REO Sales Guide, CYPREXX is the vendor responsible for service in New York for initial services and ongoing maintenance. See Exhibit "P" at 67-68.

## Plaintiff's Deposition

30. Plaintiff testified at her deposition on May 1, 2015. A copy of the deposition transcript is annexed hereto as Exhibit "I".

31. Plaintiff has worked for World Homes Realty, previously known as Prudential World Homes Realty since around 2000 or 2001. See Exhibit "I" at 17-18. Plaintiff is an independent contractor. Id. at 17.

32. On May 21, 2011 plaintiff had an accident at 71 Richardsville Road in Carmel, New York. Id. at 41-42. Plaintiff was showing the property. Id. at 42. FANNIE MAE owned that property as per the property's listing. Id.

33. Plaintiff had been to the property before the date of the accident. Id. at 44. Plaintiff does not recall specifically when, but it was less than six months before her accident. Id. at 44.

34.    Plaintiff reviewed the MLS Listing Sheet for the property before May 21, 2011. Id. at 50. The listing indicated that the property had environmental hazards or conditions. Id. at 51. Environmental hazards meant to her radon, mold, oil tank, oil spill or pollution.   Id. at 52.      There was no indication on the listing as to hazardous conditions concerning porch railings or steps. Id. at 52.

35.    On the date of the accident, plaintiff was showing the property to customer Michael Moccia, and his friend. Id. at 56. When she arrived at the property, she walked up the steps adjacent to the front porch. Id. at 58. The property was in disrepair. Id. at 61.   The property had buckling floors, water in the basement and mold inside the house. Id. The stones that formed that platform of the outside stairs were loose. Id. at 61.

36.    Plaintiff walked through the house with her customer and then walked out of the house. Id. at 66-67.

37.    They stood on the porch and talked for two to three minutes.   Id. at 71. She turned and headed back towards the front door of the house. Id. She put her hand on the railing and the railing gave way.  Id.  The railing was three feet high and had spindles. Id. at 71-72. The railing was attached to posts. Id.

38.    Plaintiff did not know what caused the handrail to fall. Specifically, she was asked and answered the following questions:

> Q:    So my question is, if you weren't using the railing to maintain your balance, how is it that you fell?
>
> A:    If I knew that it would be a miracle. I don't know.
>
> Q:    When the railing began to fall did you continuously hold onto that railing?

> A:   I don't know.
>
> Q:   So as we sit here today you don't know how you fell over?
>
> A.   No. All I remember is a squeak and the next thing I remember is what I see in the pictures.

Id. at 229 lines 8-10; 11-24.

39.   Plaintiff was shown two photographs marked as Exhibits "M" and "N" at the deposition, which are collectively annexed hereto as **Exhibit "Q"**.

40.   The only detriments plaintiff was aware of to the property before she showed the property was water in the basement, mold in the living room and buckling floors in the living room. Id. at 235.

## DEPOSITON OF FANNIE MAE BY COURTNEYSCHNELL

41.   Ms. Schnell testified at a deposition on behalf of FANNIE MAE. A copy of the transcript from Ms. Schnell's deposition is annexed hereto as Exhibit "J".

42.   Ms. Schnell has been employed with FANNIE MAE for ten years and is currently a manager in the sales department. See Exhibit "J" at Id. at 8. Ms. Schell manages a group of sales representatives who work with and manage a network of agents who manage FANNIE MAE properties through the marketing and the selling of the properties. Id. at 9.

43.   The sales representative works with the agent on all aspects of the property, including identifying occupancy issues, getting the property ready for marketing, marketing the property, and then negotiating offers. Id. at 9.

44.   Once properties have been foreclosed on by the mortgage servicer, the properties are included in FANNIE MAE's foreclosure inventory. Id. at 11.  FANNIE

MAE enters into agreements with vendors, brokers/agents and preservation companies. Id. at 12-13.

45.    FANNIE MAE has a proprietary system that is referred to as "TRAX", which is a system of record by which FANNIE MAE obtains its information regarding the properties. Id. at 20.  TRAX contains data regarding the property and information that is used by FANNIE MAE departments in preparation of the property listing and selling of the property.  Id.

46.    Pursuant to the REO Sales Guide, the broker/agent is required to do an initial inspection, which includes verifying occupancy and determining overall conditions of the property.  Id. at 26. If there is a need for additional maintenance or if there are concerns regarding the property prior to listing the property, the broker/agent is required to facilitate that. Id.  The REO Sales Guide requires the broker/agent to inspect the property weekly to insure that FANNIE MAE and other vendors are aware of any additional issues that may occur, such as structural or material changes. Id. at 27.

47.    The agent is required to maintain any comments in the TRAX system of the weekly inspection if issues arose. Id. at 29.  Notation of any issue is recorded within the TRAX system.  Id. at 32.    TRAX is the primary source of information from the broker to FANNIE MAE. Id. at 32.

48.    The broker agent is able log into the TRAX system and make entries into the properties that are assigned to them Id. at 32-33. All information concerning the property located at 71 Richardsville Road for the period of May, 2011 and prior is contained in TRAX.  Id. at 35.  With the weekly inspections, there are no reports. Id. at

37. The FANNIE MAE sales representative and representatives from other FANNIE MAE departments reviews the TRAX notes. Id. at 38.

49. The printout from the TRAX system concerning this property was marked as plaintiff's Exhibit "4" for identification at Ms. Schnell's deposition. Id. at 77. A complete copy of a printout from the TRAX system concerning this property is annexed hereto as **Exhibit "R"**.

50. FANNIE MAE provides the REO Sales Guide to the broker/agent as outlined in the FANNIE MAE Master Listing Agreement. Id. at 54-55. The REO Sales Guide communicates to the broker/agents and vendors the standards by which they perform services. Id. at 57-58.

51. FANNIE MAE must approve all contractors who work on the property. Id. Approval is obtained through TRAX, email or telephone. Id. at 68. AMN (Asset Management Network) is the portal by which FANNIE MAE's outside vendors access TRAX. Id. at 70. All information put in AMN is contained in TRAX. Id.

52. Ms. Schnell reviewed the TRAX entries concerning the subject property. Id. at 144-145. She noted all the comments made by WORLD HOMES concerning work that needed to be done. An entry dated March 19, 2010 by WORLD HOMES notes that the property is not ready to list due to extreme discoloration conditions and that trash out was not completed by CYPREXX. Id. at 90.

53. An entry dated March 20, 2010, attaching an email from Anthony Aquilia to Veronica Butticarlo, noted that trash out had not been completed. Id. at 91-92. Mr. Aquilia indicated in the email that trash out was cancelled due to discoloration. Id.

54.    Ms. Schnell referred to an entry dated April 13, 2010 by WORLD HOMES. In the entry, WORLD HOMES indicated that buyer feedback is that the property is priced too high because of extensive repairs needed and discoloration. Id. at 99.

55.    Ms. Schell spoke with Ms. Buttucarlo regarding the property prior to the deposition testimony. Id. at 108. Ms. Butticarlo advised that all information she recalled concerning the property was contained in the TRAX system. Id. Ms. Buttucarlo did not mention issues regarding the railings at the properties before plaintiff's accident. Id. at 109.

56.    From her review of the TRAX system concerning the property, WORLD HOMES and the vendors did not write issues regarding the front stairs or railing for the front stairs. Id. at 122. There were no entries in TRAX made by WORLD HOMES or vendors concerning complaints with regard to the front porch or railing of the front porch Id. at 122-123. There were no entries in the TRAX system requesting approval for repairs the front stairs, front railing or front porch. Id. at 129-130.

57.    Ms. Schnell reviewed color photographs uploaded in TRAX, which were contained in the broker's price opinion. Id. at 131. The photographs showed the railing to the front stairs, front porch and front porch railing.   Id. at 131-132. From the photographs provided, Ms. Schnell did not observe any parts of the stairs, railings or front porch to be broken or in disrepair. Id. at 132-134.

58.    The TRAX notes indicate at least 20 showings of the house from January 2011 to March 2011. Id. at 139. There were no reports of problems pertaining to the porch railing following the showings. Id. at 140. In April 2011, there was a potential

buyer. Id. at 140-141.  FANNIE MAE was not notified of issues regarding the front

porch or railing pertaining to the potential buyer.  Id.

59.    In preparation for her deposition, Ms. Schnell reviewed the TRAX entries,

the broker's price opinion, pictures and agreements. Id. at 144-145. In her review of

these documents, Ms. Schnell did not see complaints, issues or concerns regarding

the front porch, front stairs, or front railing. Id. at 145-146.

## DEPOSITION TESTIMONY OF WORLD HOMES

60.    Anthony Aquilia testified at a deposition for WORLD HOMES. A copy of

Mr. Aquilia's deposition transcript is annexed hereto as Exhibit "K".

61.    Mr. Aquilia has been employed by WORLD HOMES since 1997. See

Exhibit "K". In May 2011, WORLD HOMES listed bank owned properties for sale. Id. at

15. His responsibilities as a listing agent in May 2011 were to install a lockbox, place a

sign on the property and list the property on MLS. Id. at 25.

62.    Veronica Butticarlo of FANNIE MAE assigned the property located at 71

Richardsville Road in March 2010. Id. at 28. Mr. Aquilia uses the broker checklist from

the REO Sales Guide with respect to performing his inspections at the property. Id. at

60-64.

63.    Mr. Aquilia first went to the property in March 2010. Id. at 31. On the first

visit, he walked on the front porch.  Id. at 34. He walked up the steps and used the

railing to access the porch to get to the front door. Id.. at 35.  Mr. Aquilia touched the

railing that was involved in plaintiff's accident.  Id. at 97.  When he touched the railing,

he did not notice a dangerous or defective condition on that initial visit.  Id.  Mr. Aquilia

determined there was garbage on the porch. Id. at 35-36. However, he did not make other determinations with regard to the porch. Id.

64.    After the initial visit, Mr. Aquilia went to the property every week for approximately 60 visits. Id. at 37. The visits were the same. Id. at 38. In his weekly visits, he checked that: the "for sale" sign was still up; the lockbox was still properly coded and contained the key; and checked that the lights were working. Id. at 38-39. On his weekly visits, he would walk around the house to determine if there were exteriors problems, including looking at the porch and the railing on the porch. Id. at 130-131. If Mr. Aquilia noticed anything during his 60 visits, he would have entered it into the TRAX system. Id. at 39-40. Mr. Aquilia did not discover anything that would require a report to FANNIE MAE regarding the porch area. Id. at 39.

65.    During the 60 visits between March 2010 and May 2011, Mr. Aquilia did not notice a dangerous or defective condition with respect to the porch, porch railings or spindles attached to the porch. Id. at 40. In his observations, there was no physical damage with respect to the porch from March 2010 to May 21, 2011. Id. at 52. The property had discoloration, which is an environmental hazard and is similar to mold. Id. at 54-55.

66.    Most of the WORLD HOMES agents showed the property. Id. at 42-43. None of the WORLD HOMES agents made complaints to Mr. Aquilia about the condition of the porch, handrails or spindles attached to the porch from March 2010 to May 21, 2011. Id. at 43-44.

67.    Mr. Aquilia identified the printout of the comments that he entered into TRAX for FANNIE MAE to review and to respond or not to respond. Id. at 76. This

document includes all of the entries made by WORD HOMES to FANNIE MAE from the date the property was assigned. Id. at 76. Mr. Aquilia reviewed the entries from March 2010 to May 21, 2011. Id. at 79-80. He did not send correspondence concerning dangerous or defective conditions with respect to the porch, handrails attached to the porch or spindles attached to the porch handrail. Id. at 79-80.

68.    Mr. Aquilia was involved with having the railing repaired after plaintiff's accident. Id. at 86. On May 25, 2011, Mr. Aquilia wrote to Veronica Butticarlo for approval of the cost to repair the porch railing that was broken. Id. at 87. The original railing was used in the repairs. Id. at 88. There was nothing wrong with the wood. Id. The contractor was able to put it together so there was no new railing needed. Id.

69.    Mr. Aquilia identified a photograph he had taken, which was marked as defendants' Exhibit "E" for identification. Id. at 95-96. The photograph shows the contractor sitting on the exact railing that was involved in the accident. Id. at 96.

## DEPOSITION TESTIMONY OF CYPREXX BY TONY ELLIOTT

70.    Tony Elliott testified on behalf of CYPREXX. A copy of the transcript from Tony Elliottt's deposition is annexed hereto as Exhibit "L". CYPREXX, generally, handles client's REO Properties from pre-foreclosure to preservation to repairs. See Exhibit "L" at 8. REO stands for "real estate owned" bank foreclosures. Id.

71.    The preservation department within CYPREXX handles the initial services for properties, which then turn into preservation and maintenance of the property while the property is on the market. Id. at 9. Initial services include clean up and minor restoration. Monthly preservation is then performed for upkeep of the property. Id. at 15.

72.    Mr. Elliott did not handle the subject property while employed with CYPREXX. Id. at 21. However, he reviewed documents to prepare for his deposition, including photographs, vendor agreements, the REO Sales Guide and work orders. Id. at 18.

73.    Generally speaking, an agent or broker would request a repair. Id. at 22. A vendor could also request a repair after doing an inspection or service on the property. Id. A request to CYPREXX for repair is made through the database system the client uses. Id.

74.    In 2010 and 2011, the CYPREXX system of record was the REO Track that connects to CYPREXX's clients to accept information from the client. Id. at 24. CYPREXX enters information into their client's databases through REO Track. Id. at 25.

75.    The preservation manager at CYPREXX oversees that initial services are performed. Id. at 26. The preservation coordinator assigned to the property has direct contact with the listing agent and vendors. Id. at 27. Communication between the preservation coordinator, listing agent and vendors are done through e-mail, telephone and the REO Track system. Id. at 27.

76.    Initial services include the trash out of the property. Id. at 28. Vendors perform the initial services.   Id. at 28.   When initial preservation services are completed, the vendors communicate through telephone, e-mail or the REO Track system. Id. at 28. Vendors then send invoices and photographs to CYPREXX upon completion of the work. Id. at 29.

77.  After initial preservation services, a maintenance schedule is assigned to the properties.  Id. at 30.  Maintenance includes landscaping four times a month and monthly maid/cleaning services.  Id.

78.  In 2010 and 2011, repairs were performed to the assigned properties when requested by the client.  Id. at 31.  The client's system of record would have information regarding client's request for repairs.  Id. at 31.  The listing agent would also make requests for repairs.  Id. at 32-33.

79.  In the documents Mr. Elliott reviewed in preparation for his deposition, he did not see notations requesting to replace missing or loose handrails regarding the subject property.  Id. at 46.  If FANNIE MAE made a request for certain work done at the property, it would be noted in the REO Track system.  Id. at 62.  In the documents he reviewed, he did not see notations up to May 21, 2011indicating there were loose or missing handrails at the property.  Id.  Mr. Elliott did not see entries concerning repairs of handrails or railings prior to May 21, 2011.  Id. at 65.

80.  In the records, he observed an e-mail from Anthony Aquilia to Nicole Garrett of CYPREXX that the snow was not completely removed.  Id. at 48-49.  There was also an e-mail from Mr. Aquilia to Nicole Garrett referencing repairs to a door frame.  Id. at 50.

**PRINT OUT FROM TRAX SYSTEM**

81.  A print out of the entire TRAX entries concerning the subject property is annexed hereto as **Exhibit "Q"**.  The initial entry made by WORLD HOMES REALTY is noted on March 2, 2010.  At that time, the property is re-keyed.  The author noted

discoloration and peeling paint throughout the house. There were no other entries concerning the initial visit.

82. On March 17, 2010, WORLD HOMES REALTY noted that no services were done on the property.

83. On March 19, 2010, WORLD HOMES REALTY made an entry indicating that they spoke with the representative on March 18, 2010 with regard to the property not being ready to list due to extreme discoloration conditions and that the trash out was not completed by CYPREXX. On March 19, 2010, Veronica Butticarlo attached an e-mail from Mr. Aquilia dated March 17, 2010 advising the property had not been trashed out.

84. On March 22, 2010, Veronica Butticarlo attached an e-mail from Mr. Aquilia dated March 22, 2010 advising that CYPREXX still had not trashed out this property.

85. On March 23, 2010, Veronica Butticarlo attached an e-mail from Mr. Aquilia dated March 23, 2010, attaching a contractor bid to repair a broken window at the property.

86. On March 24, 2010, WORLD HOMES REALTY made an entry indicating that trash out services still had not been completed.

87. On April 2, 2010, WORLD HOMES REALTY made an entry indicating that debris was not removed from the front porch or around the exterior perimeter of the house.

88.   On April 13, 2010, WORLD HOMES REALTY made an entry indicating that from the showings from the property, the buyer feedback was that the property was priced too high because of extensive repairs needed and heavy discoloration.

89.   On May 7, 2010, WORLD HOMES REALTY made two entries. The first entry noted that buyer feedback is that the property may be a "tear down" and therefore the price is too high. There was also an entry indicating that there were eight showings in the month of April.

90.   On June 12, 2010, WORLD HOMES REALTY noted that there were four showings in the month of May. There was also an entry that the buyer feedback was that the house is a "tear down" and overpriced.

91.   On July 11, 2010, there were three showings in the month of June. As per the entry made by WORLD HOMES REALTY on August 19, 2010, there were two showings in July 2010.

92.   WORLD HOMES REALTY made two entries on September 2, 2010. One entry indicated that there were four showings in the month of August. The second entry indicated that the buyer feedback was that the house was a "tear down" and the price had to be reduced to attract investors.

93.   On October 1, 2010, WORLD HOMES REALTY noted there was one showing for the month of September.

94.   An entry dated January 6, 2011 by WORLD HOMES REALTY noted there was one showing for the month of December.

95.   On January 8, 2011, Mr. Aquilia sent a request to Veronica Butticarlo for an approval for costs to clean up and dispose of debris as a result of some damage

caused to the ceiling inside the house when a small animal gained entry through the roof. On January 14, 2011, Mr. Aquilia sought a request for a bid for CYPREXX to remove the wild animal and to repair the damage.

96. An entry dated February 5, 2011 by WORLD HOMES REALTY notes that there were six showings in the month of January.

97. An entry dated February 18, 2011 by WOLRD HOMES REALTY indicates that CYPREXX failed to remove snow at this property since the last major snowfall.

98. An entry dated March 3, 2011 indicates there were eight showings in the month of February.

99. An entry dated March 6, 2011 from Veronica Butticarlo refers to a repair to the front door frame to property secure the property.

100. An entry dated April 1, 2011 by WORLD HOMES REALTY indicates that there were 14 showings in the month of March.

101. An entry dated May 3, 2011 indicates that there were 14 showings for the month of April. The next entry from WORLD HOMES REALTY is dated May 22, 2011 concerning plaintiff's accident, which occurred on May 21, 2011.

## THERE IS NO EVIDENCE OF NEGLIGENCE ON
## BEHALF OF ANY OF THE DEFENDANTS

102. There is no evidence that defendant/third-party plaintiff FANNIE MAE is negligent. In order to prevail on her claim against FANNIE MAE, plaintiff must prove that FANNIE MAE created the defective handrail or that FANNIE MAE had notice or should have had notice of the defective handrail.

103. FANNIE MAE was not at the property. Thus, there is no evidence that FANNIE MAE created the condition. Based upon the documents, in particular, the

TRAX system, which is FANNIE MAE's primary form of communication with its listing agents and vendors, there is no indication that FANNIE MAE had notice of a defective handrail.

104. FANNIE MAE assigned the subject property to WORLD HOMES to list the property. Mr. Aquilia performed an initial inspection of the property and then performed weekly inspections. WORLD HOMES also showed the property on numerous occasions. During these visits, there is no indication that anyone complained about the handrail on the porch.

105. Additionally, CYPREXX hired vendors to perform initial services, as well as routine maintenance. There is no indication that CYPREXX's vendors made complaints in the TRAX system to FANNIE MAE concerning a broken or defective handrail. Accordingly, there is no evidence that FANNIE MAE would have had notice of the defective handrail. For this reason, it is respectfully submitted that all claims as against FANNIE MAE should be dismissed. Therefore, the third party action as against WORLD HOMES would automatically be dismissed as well.

106. Notwithstanding the fact that plaintiff's claims as against FANNIE MAE should be dismissed, it is respectfully submitted that all claims as against WORLD HOMES should be dismissed independent of how this Court finds for FANNIE MAE with respect to plaintiff's claims as against FANNIE MAE.

107. In the third-party complaint, FANNIE MAE claims that WORLD HOMES breached its contract with FANNIE MAE by failing to properly inspect and repair the property. FANNIE MAE also claims that pursuant to the contract, WORLD HOMES is obligated to defend, indemnify and hold harmless FANNIE MAE in the action brought

by plaintiff, as a result of WORLD HOMES' negligent acts. FANNIE MAE also asserted negligence claims for common law indemnity and contribution. See Exhibit "C".

108. Based upon the Master Listing Agreement between FANNIE MAE and WORLD HOMES, as well as the REO Sales Guide, WORLD HOMES was not obligated to perform repairs. Additionally, there is no evidence that WORLD HOMES was negligent with regard to its obligation in listing the property and performing its initial inspection and weekly inspections.

109. There is no evidence that WORLD HOMES had notice of the defective handrail. WORLD HOMES was not required to inspect the handrail. Nonetheless, Mr. Aquilia touched the handrail on the porch and did not feel it to be loose or defective.

110. Mr. Aquilia made approximately 60 inspections at the property between March 2010 and May 21, 2011. There were also numerous showings of the property between March 2010 and May 21, 2011. During his inspections, Mr. Aquilia did not observe the handrail to be loose or defective. No one made complaints during any of the showings concerning a loose or defective handrail on the porch. Mr. Aquilia reported other conditions to FANNIE MAE in TRAX concerning the property, including discoloration, the need for trash out, the need for snow removal, a broken window, a broken door and damage to the roof due to a wild animal. If he noticed a condition concerning the loose handrail, he would have reported it in TRAX.

111. Accordingly, the claim that WORLD HOMES breached its contract with FANNIE MAE by failing to properly inspect and repair the property cannot be substantiated. Therefore, the claim for breach of contract must be dismissed.

112. WORLD HOMES also does not have an obligation to indemnify, hold harmless and defend FANNIE MAE. Under **Paragraph 12. Indemnity** of the Master Listing Agreement, WORLD HOMES agreed to:

> indemnify, hold harmless, and defend Fannie Mae ... against all claims ..., including reasonable attorneys' fees and costs of suit, arising out of or resulting from any third-party claim in connection with ... (c) Broker's negligence, willful misconduct, breach of any representation or warranty under this Agreement, or failure to perform its obligations under this Agreement; (d) any injuries to persons (including death) or damages to property caused by the negligent or willful acts or omissions of Broker or a subcontractor's ....

See Exhibit "O" at 18, paragraph 12.

113. For the same reasons stated above, in paragraphs 107 through 110, there is no evidence that WORLD HOMES was negligent, engaged in willful misconduct or breached a representation or warranty under the Master Listing Agreement. Therefore, the indemnification provision has not been triggered. Thus, FANNIE MAE's claim for contractual indemnification must also be dismissed.

114. FANNIE MAE's claims for common law indemnification and contribution require a showing that WORLD HOMES was negligent. In that there is no evidence that WORLD HOMES was negligent, these claims must be dismissed as well.

115. Accordingly, it is respectfully submitted that plaintiffs claims as against FANNIE MAE must be dismissed, which requires an automatic dismissal of all of FANNIE MAE's claims in its third party action as against WORLD HOMES. In any event, in that there is no evidence that WORLD HOMES breach its contract with FANNIE MAE, or was negligent, WORLD HOMES' motion for summary judgment dismissing the third-party action must be granted.

WHEREFORE, on the grounds that there is no basis for plaintiff's claims as against FANNIE MAE, and in that there is no basis for FANNIE MAE's claims for breach

of contract, contractual indemnification, common law indemnity and common law contribution, it is respectfully submitted that the third-party complaint of FANNIE MAE be dismissed in its entirety pursuant to Federal Rules of Civil Procedure Rule 56, together with such and further relief as this Court may deem just and proper.

Dated: Hicksville, New York
        September 25, 2015

                                                    /s/
                                        _____
                                        MARGOT L. LUDLAM
                                        (MLL)#5686